# **Exhibit 1**

facilitysource®
WORLD LEADER IN FACILITY MANAGEMENT

# Required Documents

DS
13 KC

**W-9**

**Certificate of Insurance**

**Expiration Date for Certificate of Insurance:**

**Additional Insurance**
Attach any additional insurance certificate(s) below if not included in the Certificate of Insurance (Auto, Workman's Compensation, etc.)

**Expiration Date for Additional Insurance:**

State the following in the Description of Operations/Locations/Vehicles box:

*FacilitySource, LLC and Client are named as additional insureds, on a primary and noncontributory basis, as required by written contract.*

List the following in the Certificate Holder box:

**FacilitySource, LLC**
**2020 N. Central Ave., Suite 1200**
**Phoenix, AZ 85004**

All vendors shall maintain insurance as follows

- Commercial General Liability Insurance - $1,000,000 / with $2,000,000 General Aggregate / with $1,000.000 for Each Occurrence. FacilitySource, LLC and client must be named as Additional Insureds on a primary on noncontributory basis.
- Automobile Liability Bodily Injury Per Person – State Requirement
- Worker's Compensation levels must meet state requirements.

Service Provider agrees to only use third-party providers with commensurate or greater liability coverage.

© FacilitySource, 2015 Proprietary & Confidential | No Part of This Document May Be Used Without Express Written Permission.

DocuSign Envelope ID: 845B2B3D-70A6-418A-A6C1-7BCAA3546A6A

facilitysource®

# SERVICE PROVIDER AGREEMENT

This SERVICE PROVIDER AGREEMENT ("Agreement") is made and entered into as of this 26 day of February, year 2018 ("Effective Date") by and between FACILITYSOURCE, LLC and its related entities ("FS"), with its principal place of business at 2020 N. Central Avenue., Phoenix, Arizona, 85004, and Flashover Maintenance, LLC ("Provider"), with its principal place of business located at 1505 North Market Galion, OH 44833. Sometimes FS and Provider are individually referred to as "Party" or jointly as "Parties."

## RECITALS

**WHEREAS**, FS is in the business of, including, but not limited to, providing integrated facility maintenance and repair services to retail and commercial customers of FS;

**WHEREAS**, Provider is a qualified company that can perform the services as described herein; and

**WHEREAS**, Provider desires to provide the services described herein to customer(s) of FS, at one or more locations designated by FS.

**NOW THEREFORE**, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties mutually agree as follows:

## 1. SERVICES

(a). Provider shall perform the services described in the Schedules, (sometimes collectively referred to as "Schedules") attached hereto and made a part of this Agreement. The services and performance expectations in the Schedules are hereinafter referred to as the "Services".

The Services shall: (i) be performed by the Provider in accordance with the specifications set forth in the Schedules; (ii) be performed by the Provider to the reasonable satisfaction of FS's customer(s); (iii) be performed by the Provider on the days and during the hours specified by FS's customer(s); (iv) be of first class professional and technical quality, consistent with generally accepted standards of the applicable industry and suitable for use as contemplated by FS; and (v) be delivered by Provider in accordance with the delivery schedule required by FS, if any, time being of the essence with respect to Provider's completion and delivery of all Services hereunder.

(b). Except as may otherwise be specifically set forth herein, Provider shall be solely responsible for any and all expenses incurred by Provider in the course of performing the Services. All materials, products, and equipment used by Provider shall be subject to approval by FS's customer(s) for the Services. All equipment used by Provider in performing the Services shall be in good and safe working order. Any Service that does not meet the specifications set forth in this Agreement or in any Schedule hereto shall be immediately corrected by the Provider (without additional charge), and FS may, at its sole discretion, deduct up to the full amount due to Provider for any Service that Provider does not correct.

(c). Provider will comply with all procedures specified by FS or the FS customer(s) in performing the Services.

(d). Provider acknowledges that there is no guarantee as to the number of locations or volume of business Provider will be awarded under this Agreement. Provider acknowledges that its investment in equipment, materials, personnel, and facilities utilized to render the Services described herein is at the Provider's discretion and risk.

(e). FS shall have access to, and be allowed to, review and inspect all documents, plans, invoices, and other reasonably related documents, associated with Provider's performance of the Services, as well as have access to, and discussions with, Provider's personnel on a regular and ongoing basis concerning the Services being performed by Provider.

(f). Provider warrants that it has the requisite power and authority to enter into and perform its obligations under this Agreement.

## 2. PAYMENT TERMS

In consideration of Provider performing the Services, FS, upon acceptance and approval of Provider's invoice(s) for the Services performed, shall pay Provider no later than forty-five (45) calendar days after FS receives payment from the particular customer(s) of FS that Provider is providing Services at physical locations for pursuant to this Agreement. Provider acknowledges that the payment terms are clear and unambiguously stated.

The Parties hereby agree that Arizona law governs the foregoing payment terms and, therefore, the payment terms shall operate as a "Pay-If-Paid" provision. However, if the preceding clause should be found to be invalid, then the foregoing payment terms shall operate as a "Pay-If-Paid" provision as to all Services performed under this Agreement in the following jurisdictions: Alabama, Alaska, Arizona, Arkansas, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Iowa, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, New Hampshire, New Jersey, North Dakota, Pennsylvania, Rhode Island, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, and Wyoming. If the Services are performed in the foregoing jurisdictions, Provider acknowledges that it has considered the solvency of FS's customer(s) and FS's customer(s) ability to perform the terms of its contract with FS before entering into this Agreement. Provider further acknowledges that it relies on the credit of FS's customer(s), and not FS, for payment under this Agreement. Provider is likewise entering into this Agreement with the full understanding that Provider is accepting the risk that FS's customer(s) may be unable to perform the terms of its contract with FS. Provider agrees that as a condition precedent to FS's obligation to make payment to Provider, FS must receive payment from its customer(s). In the event that FS does not receive all or part of the payment from FS's customer(s) in respect to Provider's Services, whether because of a claimed defect or deficiency in Provider's Services, or for any other reason, FS shall not be liable to Provider for any sums in respect hereto. For those Services not performed in the foregoing jurisdictions, the foregoing payment terms shall be considered a "Pay-When-Paid" provision.

FS payment to Provider under this Section is contingent on Provider's strict compliance with Section 3, "Billing and Payment Procedures," below.

## 3. BILLING AND PAYMENT PROCEDURES

(a). The billing procedures to be followed by Provider may be set forth in separate Schedule(s) to this Agreement. The billing procedures may vary by location depending on the type of Service(s) that the Provider is providing for that location. All invoices shall include all costs for all materials, supplies, labor, and taxes. Provider is required to provide a timely invoice to FS, provide all documentation required by FS to substantiate the Services provided, and follow all FS's procedures and guidelines for invoicing (which may, from time to time, be changed or modified by FS upon reasonable notice to Provider) in order for Provider to receive potential payment for such Services.

(b). Invoices pertaining to any Services other than preventative maintenance shall be submitted no later than ten (10) calendar days after the completion of Services with respect to which the invoice relates. These invoices are considered untimely if they are submitted more than ten (10) calendar days after the completion of Services. Invoices pertaining to preventative maintenance shall be submitted no later than ten (10) calendar days following the end of the month in which the preventative maintenance was completed. These invoices are considered untimely if they are submitted later than ten (10) calendar days following the end of the month in which the preventative maintenance was completed.

(c). If FS has made any advances to Provider and is unable to collect payment from its customer(s), then FS may deduct the advanced amount from Provider's payment.

(d). Notwithstanding the terms of Section 3(b) above, if Provider submits an untimely or non-compliant invoice, FS reserves the right to submit the invoice to its customer(s) and seek to have the customer(s) pay the invoice. If the customer(s) elect(s) to pay such invoice, FS will only pay Provider no later than forty-five (45) calendar days

after FS receives payment from the particular customer(s) of FS that Provider is providing Services at physical locations for pursuant to this Agreement.

**4. SALARY, BENEFITS, TAXES, ET AL.**

Provider is solely responsible for all salaries, meeting minimum wage and overtime requirements, employee benefits, federal and state income taxes, social security taxes, federal and state unemployment insurance, any and all similar expenses and/or taxes, and all other assessments, taxes, contributions, expenses, and sums payable with respect to Provider, any subcontractor, and/or their employees and agents as a result of and/or in connection with the Services performed by Provider hereunder, and Provider will file all tax returns and reports with respect to any of the foregoing. Provider shall collect and pay appropriate taxing authorities, and be reimbursed for, all sales, consumer, use, and other taxes ("Sales Taxes") directly related to the Services and required to be paid by applicable law, and shall indemnify FS from any and all underpayments, and associated penalties, fees, and interest relating to the miscalculation of the Sales Taxes or FS payment of such Sales Taxes to the applicable taxing authorities, and shall secure and pay for all permits and other governmental fees, licenses, and inspections required by the Services rendered. All such Sales Taxes shall be separately stated on each invoice.

**5. WAIVER OF RIGHTS**

(a). Provider acknowledges and assumes the risk of non-payment or delay of payment by the customer for any reason. Provider shall not for any reason seek or demand payment from FS customer(s). FS is not required to take legal action to collect any customer payments.

(b). To the extent permitted by applicable law, Provider agrees that Provider and its subcontractors shall not place a lien on FS property or on FS customer's property, and Provider waives all rights to place such a lien. Provider agrees that the Services are not improvements to property. If a lien is placed on FS property or FS's customer's property by Provider or any of its subcontractors, FS and/or FS's customer(s) shall be permitted to discharge it, and Provider agrees to reimburse FS and/or FS's customer(s) for all costs and expenses related thereto.

**6. TERM**

Unless a Schedule to this Agreement states otherwise, the Services to be provided hereunder shall be for a term commencing on the Effective Date and expiring on the first anniversary of the Effective Date, subject to the following renewal terms. Unless Provider or FS terminates this Agreement in writing not less than 30 days prior to the expiration date of the current term, the term will automatically renew for successive one-year terms. In addition, FS may extend the Term of this Agreement for up to 90 calendar days in order to provide a reasonable transition for customers of FS in connection with the expiration of the term or termination.

**7. TERMINATION**

(a). FS shall have the right to terminate this Agreement, or any Schedule hereto, in part or in whole, for FS's convenience and without cause, by giving thirty (30) days' written notice to Provider. Termination shall be effective as of the effective date provided in the written notice of termination. In such event, Provider shall be entitled only to portions of compensation earned as of the effective date of termination. Upon receipt of written notice from FS of termination, Provider shall (i) cease performance of the Services as directed in the notice; (ii) take actions necessary, or that FS or FS's customer(s) may direct for the protection and preservation of the Services; (iii) except for Services directed to be performed prior to the effective date of termination stated in the notice, terminating all existing contracts and purchase orders and enter into no further contracts or purchase orders; (iv) promptly return all confidential information of FS or FS's customer(s) in its possession; and (v) promptly return to FS and/or FS's customer(s) all FS and/or FS's customers data and data relating to FS and/or FS's customers.

(b). FS shall have the right to terminate this Agreement, or any Schedule hereto, at FS's sole option and with immediate effect, if: (i) FS or a FS customer notifies Provider that its Services are unsatisfactory; (ii) Provider violates any of the terms or provisions of this Agreement; (iii) Provider is unable to timely and properly perform the Services; (iv) Provider becomes insolvent or declares bankruptcy; (v) Provider subcontracts any portion of the Services without written authorization from FS; (vi) Provider fails to fully cooperate with FS or a FS customer in

any security investigation; or (vii) the contract between FS and FS's customer(s) receiving the Services terminates for any reason.

**8. CONVERSION TO TERMINATION FOR CONVENIENCE**

If FS terminates this Agreement, or any Schedule hereto, for cause under Section 7(b) above, and it shall be determined that FS's termination was wrongful or unjustified, such termination shall be deemed to have been a termination for FS's convenience under Section 7(a).

**9. PROVIDER'S RESPONSIBILITIES AND REPRESENTATIONS**

(a). Except for, and to the extent of, injuries resulting from the negligence or intentional acts of FS or its agents, while Provider is on FS property, or that of its customers, FS shall have no obligation whatsoever to compensate Provider, any subcontractors or any of their employees or agents on account of any injuries (including, but not limited to, bodily injury and death) which Provider may sustain as a result of, or in the course of, the performance of the Services, and Provider hereby waives, on Provider's own behalf and on behalf of any persons claiming by, through, or under Provider (including, but not limited to, any subcontractors), any and all rights of recovery which Provider may now or hereafter have against FS on account of any such injuries.

(b). Provider hereby warrants and represents to FS that Provider: (i) shall comply with all applicable federal, state, and local laws, rules, regulations, codes, statutes, ordinances, and orders of any governmental and/or regulatory authority, including, but not limited to, wage and hour laws, minimum wage and overtime, workers compensation and unemployment insurance, OSHA regulations, and withholding and reporting requirements for all individuals who provide services in connection with this Agreement; (ii) shall comply with the federal program known as "E-Verify," certify that an Employment Eligibility Verification Form (Form I-9) has been completed for each person who performs work for Provider, and retain such forms for the time period required by applicable laws; (iii) has obtained all licenses, professional registrations, and permits required to observe and perform the terms, covenants, conditions, and other provisions on Provider's part to be observed and/or performed under this Agreement; (iv) any material or work product provided by Provider under this Agreement, and the use of any such material or work product, shall not infringe upon any patent, trademark, copyright, or trade secret, or otherwise violate the privacy or other rights, of any person, firm, or corporation, and upon delivery to FS shall be free and clear of any and all claims, liens, mortgages, or other encumbrances of any kind or nature whatsoever; and (v) will perform the Services required to be performed hereunder in accordance with generally accepted professional standards and in the most expeditious, economical, and competent manner consistent with the best interests of FS and FS's customer(s).

(c). Provider agrees to permit FS, at its request and upon reasonable advance notice, to visit Provider's offices and review and copy Provider's records related to this Agreement. From time to time, and not less than annually, FS may require Provider to reconfirm its compliance with this Section by executing and returning another compliance certificate. FS may request documentation from Provider to demonstrate Provider's compliance with applicable laws including, but not limited to, a list of Provider's employees who perform the Services, as well as payroll and employment forms and documents relating to those employees. FS may immediately terminate this Agreement if Provider fails to cooperate with any such requests by FS under this Section.

**10. INSURANCE**

(a). During the term of this Agreement (beginning on the Effective Date), Provider shall purchase and maintain the insurance coverage specified in the Schedule attached to this Agreement (the "Required Insurance"). Upon the Effective Date, and 30 calendar days before each renewal of a policy providing Required Insurance, Provider shall provide FS with certificates of insurance evidencing that the Required Insurance is in effect and, upon FS's request, with complete copies of all insurance policies (including all endorsements) for the Required Insurance. All Required Insurance shall be placed with insurance companies acceptable to FS and fully licensed to do business in the state where the Services are performed, and include all of the requirements set forth in this Section. All insurance companies providing Required Insurance must have an *AM Best's* rating of at least "A- VII" or better. All approved subcontractors retained by Provider in connection with the Services rendered under this Agreement shall also be required to obtain and maintain the Required Insurance.

(b). No Required Insurance may be canceled, non-renewed, or materially revised without FS's prior written approval, and each policy providing any part of the Required Insurance will include an endorsement requiring not less than 30 calendar days' notice to FS before any cancelation, non-renewal, or material revision of the policy. Acceptance of a certificate of insurance or insurance policy does not relieve Provider of any responsibility or liability under this Agreement or in any way limit Provider's liability. In addition to the Required Insurance, Provider shall purchase and pay for all other insurance coverage required by federal, state, and local law. Provider must immediately notify FS of any injury or claim against Provider and/or FS arising out of Provider's performance of the Services, and provide FS with copies of all relevant documents, including, but not limited to, all summons and complaints asserting such claims. In the event Provider's aggregate limits of liability are reduced due to loss from claims, Provider must immediately reinstate the aggregate limits to the amounts specified in this Section.

(c). FS may, at its sole discretion, require Provider to obtain additional types and amounts of insurance as may be required by certain customers or Services to be performed by Provider. Any additional insurance shall comply with the requirements of this Agreement.

(d). In the event that Provider fails or neglects to obtain, maintain, or renew the Required Insurance, or fails or neglects to furnish FS with the certificates of insurance and copies of policies as required hereunder, FS shall have the right to either: (i) procure the Required Insurance and reduce Provider's charges for Services by the cost thereof; or (ii) deem Provider's failure or neglect as a material breach of this Agreement.

(e). Provider shall add FS and the customer(s) as an additional named insured to the Required Insurance or any other insurance required to be carried by the Provider in connection with the Services, on a primary and noncontributory basis. The Required Insurance shall not limit, or be deemed or intended to limit, Provider's liability. FS, at its sole discretion and upon notice to Provider, may increase the minimum limits of liability for Required Insurance. Should FS require Provider to increase the minimum limits of liability for the required insurance, the Provider may cancel this Agreement with 30 calendar days' notice in writing and delivered to FS at 2020 N. Central Ave., Suite 1200, Phoenix, Arizona 85004.

**11. <u>INDEPENDENT CONTRACTOR RELATIONSHIP</u>**

It is understood and agreed that Provider is acting as an independent contractor and not as FS's employee in the performance of the Services, although FS shall have the right to make recommendations concerning the procedures employed by Provider in performing the Services. Nothing herein contained shall be deemed to create an employment, agency, partner, or joint venture relationship between FS and Provider. Nothing herein contained shall constitute an express or implied current or future offer of employment by FS to Provider. Provider is responsible for all losses, damages, judgments, liabilities, claims, injuries, costs, and expenses arising directly or indirectly from the ownership and operation of its business and its performance of the Services, and has full responsibility for all debts, liabilities, and obligations of its business. Provider is not authorized to make any promise, agreement, or contract on behalf of FS or to bind FS in any manner.

**12. <u>INDEMNIFICATION</u>**

(a). To the fullest extent allowed by law, Provider shall defend (if required by FS and with counsel approved by FS), indemnify, and hold harmless FS, and its officers, directors, agents, employees, and assigns of each, FS's affiliates, FS's customer(s), and FS's customer(s)' respective members, managers, officers, directors, shareholders, employees, partners, joint ventures, agents, affiliates, successors, and assigns (collectively, the "Indemnified Parties"), from and against any and all liabilities, damages, judgments, obligations, claims, demands, losses, causes of action, settlements, deficiencies, assessments, awards, expenses, fines, costs, and penalties, including, without limitation, court costs and attorneys' fees, consultants' fees, and other fees and disbursements incident thereto of any nature whatsoever (whether based on tort, breach of contract, product liability, patent, copyright, or other proprietary rights infringement, or otherwise) (collectively "the Losses"), arising directly or indirectly from or out of: (i) any act or omission of Provider, its officers, directors, agents, or employees, or any subcontractor; (ii) any failure of Provider or Provider's subcontractor, if any, to perform the Services hereunder in accordance with generally accepted industry and professional standards; (iii) any breach of Provider's representations as set forth in this Agreement; or (iv) any other

© FacilitySource, 2016 Proprietary & Confidential | No Part of This Document May Be Used Without Express Written Permission.

failure of Provider or Provider's subcontractor, if any, to comply with the obligations on Provider's part to be performed hereunder.

(b). Provider, at its sole expense, shall defend each and every Indemnified Party from and against all allegations (even if such allegations may be later proven false, fraudulent, or groundless) asserted in any and all claims (regardless of whether a lawsuit has been filed) related in any manner to any matter for which the Indemnified Parties are indemnified under this Agreement, regardless of whether Provider's indemnity obligations, specified herein, ultimately apply and regardless of whether the allegations are directed solely against one or more of the Indemnified Parties.

(c). Each Indemnified Party hereunder shall have the absolute right to enforce its rights to either defense or indemnification under this Section, from and after the time when an Indemnified Party receives written notification that a claim or demand has been made or is to be or may be made. When an Indemnified Party settles a claim the Indemnified Party shall be entitled to indemnification for the entire amount of the settlement so long as Provider was given notice of the proposed settlement at least thirty (30) calendar days prior to settlement. If timely notice of the proposed settlement has been given to the Provider, Provider shall not dispute the reasonableness of the settlement.

(d). The Indemnified Parties' right to indemnification under this Section shall not be impaired or diminished by any act, omission, conduct, misconduct, negligence, or default (other than gross negligence or willful misconduct) of an Indemnified Party or any employee of any Indemnified Party who contributed or may be alleged to have contributed thereto in whole or in part.

## 13. LIMITATION OF DAMAGES

Notwithstanding any provision of this Agreement to the contrary, in no event shall an Indemnified Party be liable in contract or tort, including negligence and strict liability, for consequential, incidental, punitive, indirect, or special damages of any kind or character, including, without limitation, any delay damages, lost opportunity damages or lost revenues / profits, incurred by Provider or its affiliates, subcontractors, agents, or employees in connection with this Agreement or the termination of this Agreement.

## 14. PERSONNEL

Provider represents that all personnel performing any Services under this Agreement have received appropriate training for, and are qualified with respect to, the Services, and have all licenses and certifications required by applicable laws. If required by the customer(s), then Provider, at its sole expense, will perform background checks, social security verifications, and/or drug tests on any personnel that Provider intends to employ at any of that customer's locations. In addition, Provider shall not allow any employee, representative, or agent to perform Services at FS's customer locations unless and until a reasonable investigation is conducted and Provider determines that such person does not pose a reasonably ascertainable risk to the safety or property of FS's customer, its associates, customers, or invitees. Provider is responsible for all employee benefits applicable to Provider's employees who perform the Services. Provider is responsible for withholding, and the timely payment of, all FICA and FUTA taxes, and for all withheld federal and state income taxes for all personnel who perform the Services. FS shall be indemnified and held harmless by Provider from any liability, cost, or expense, including any interest, penalties, and legal fee, that may be assessed against or incurred by FS in connection with Provider's failure to make any such withholding or payment. Provider is responsible for the day-to-day management and supervision of its personnel performing the Services. Provider, upon request of the customer(s), will replace any Provider personnel immediately upon receiving notice from FS of the customer request. Provider shall maintain all payroll, employment, and withholding records for its employees and subcontractors in accordance with all laws, rules, regulations, and directives applicable thereto.

## 15. CONFIDENTIALITY

Provider agrees to keep the specific terms and conditions of this Agreement confidential and not to disclose such information to any other Party. Provider may, during the course of Provider's engagement hereunder, have access to, and acquire knowledge of or from, materials, data, strategies, systems, or other information relating to the Services or FS, or its parent, related, affiliated or subsidiary companies, which may not be accessible or known to the general public ("Confidential Information"). Any such knowledge acquired by Provider shall be kept confidential and

shall not be used, published, or divulged by Provider to any other person, firm, or corporation, or in any advertising or promotion regarding Provider or Provider's services, or in any other manner or connection whatsoever, without first having obtained the prior written permission of FS, which permission FS may withhold in its sole discretion. Upon FS's request, Provider shall immediately return to FS or destroy all documents, magnetic copies, or other physical evidence of all Confidential Information in Provider's possession or in the possession of any of Provider's directors, officers, employees, agents, or representatives (including, without limitation, all copies, transcriptions, notes, extracts, analyses, compilations, studies, or other documents, records, or data prepared by Provider) which contain or otherwise reflect or are generated from the Confidential Information without retaining any copy thereof, all of the foregoing being Confidential Information and the sole property of FS, and an officer of Provider shall certify to FS that all of the foregoing has been returned or destroyed as provided in this paragraph. In view of the Confidential Information which Provider may be provided, Provider agrees that FS would be irreparably harmed by any violation or threatened violation of this paragraph and that, therefore, FS shall be entitled to obtain a restraining order or an injunction prohibiting Provider from any violation or threatened violation of this paragraph, immediately upon application to any court of competent jurisdiction without the necessity of obtaining a bond or other surety. The provisions of this paragraph shall survive the expiration or termination of this Agreement. Provider agrees to reimburse FS on a monthly basis for all reasonable costs and attorneys' fees incurred by FS for action taken by FS under this Section.

**16. <u>PROPRIETARY RIGHTS AND OWNERSHIP OF WORK PRODUCT</u>**

(a). FS shall own all of the results and proceeds of the Services (which results and proceeds are hereafter collectively referred to as the "Work Product") in whatever stage of the Services, including, but not limited to, all written work, research, computer programs, plans, drawings, specifications, software, reports, documentation, and other tangible and intangible work product produced. FS shall have the right to dispose of the Work Product and/or make any or all uses thereof as it, at any time and in the exercise of its sole discretion, may desire. At all times, FS shall have the right to revise the Work Product in a manner deemed by FS to be best suited for its intended uses, and Provider shall not have the right of approval with respect to such changes.

(b). Work Product shall not include third-party software, FS' preexisting proprietary information, CMMS and document templates or project tools used by FS to deliver the Services, and FS-owned materials in the Work Product, including, but not limited to, data, modules, components, designs, utilities, subsets, objects, program listings, tools, models, methodologies, programs, systems, analysis frameworks, leading practices, and specifications owned or developed by FS prior to, or independently from, its engagement hereunder, including, without limitation, the fmPilot maintenance and asset management system (web-based portal and software) (collectively, "FS' Intellectual Property"). FS retains exclusive ownership rights to FS' Intellectual Property. Moreover, Work Product shall not include any of Provider's pre-existing practices or processes ("Provider Materials"), which shall, as between the Parties, be and remain the exclusive property of Provider. Provider shall, upon FS' request, return or certify destruction of all FS property in Provider's possession and shall not, at any time, reproduce or disseminate FS's property, including the FS' Intellectual Property, or any derivatives thereof, in any manner whatsoever without the express written consent of FS. Provider acknowledges that FS' Intellectual Property is unique and that monetary damages would be insufficient to compensate FS for any breach of this Section by Provider, its principals, affiliates, employees or agents. Accordingly, Provider agrees that, in addition to any other available remedy, FS shall be entitled to seek injunctive and other special and equitable relief from any court of competent jurisdiction in connection with any such breach.

(c). Provider shall deliver all originals and copies of the Work Product (whether completed or in process) and all research, plans, designs, specifications, and any other work product or information which pertains to the Work Product to FS upon completion of the Services hereunder, or within five (5) calendar days of a written request from FS, or upon earlier termination of this Agreement. Provider shall not retain, use, or disclose any of the Work Product without FS's prior written consent. The termination, completion, or breach of this Agreement on whatever grounds and by whosoever affected shall not affect FS's exclusive ownership of the Work Product.

(d). Provider hereby irrevocably assigns to FS all now known, or hereafter existing, rights of every kind, in perpetuity and in all languages, pertaining to the Work Product, including, without limitation, all benefits of any provision of law known as "droit moral," "moral rights," or any similar law and all exclusive exploitation rights, of every kind and nature, including, but not limited to, all trademarks, copyrights, and neighboring rights, to the full

extent such assignment is allowed by law, and any renewals and extensions therefore throughout the universe, in perpetuity, or for the duration of the rights in each country, and in all languages.

**17. NON-SOLICITATION/NON-DISPARAGEMENT**

a). During the term of this Agreement, and continuing for six (6) months following its termination or expiration (the "Non-Solicitation Period"), Provider shall not, either on its own behalf or on behalf of any other person or entity, offer, recruit, solicit, or attempt to influence any person to terminate his or her employment or Provider relationship with FS or its affiliates who, at any time during the Non-Solicitation Period, is known to be an employee or other Provider of FS or its affiliates.

(b). During the Non-Solicitation Period, Provider further agrees that it will not, directly or indirectly, either for the Provider or any other person, firm, FS, or corporation, in any capacity, knowingly induce or attempt to induce or call upon or solicit any of FS's or its affiliates' customers, to leave or cease doing business with FS or its affiliates, or in any way knowingly interfere with the relationship between FS or its affiliates and any of its customers. For purposes of this Agreement, a "customer" shall be any and all customers of FS or its affiliates that Provider is servicing for FS during the Non-Solicitation Period.

(c). Provider will not disparage FS or otherwise take any action which could reasonably be expected to adversely affect FS's reputation with its customers. This includes refraining from contacting any FS customers directly regarding any issues or complaints related to the billing or payment terms included in Sections 2 and 3 of this Agreement.

(d). Provider agrees that the provisions set forth in this Section are reasonable and necessary to protect the legitimate interests of FS and its affiliates and its customers, and that FS never would have entered into this Agreement in the absence of such restrictions. Provider acknowledges that a violation by Provider of the provisions of this Section may cause irreparable harm to FS, the exact amount of which will be difficult to ascertain. **Accordingly, Provider agrees that, in the event of such violation by Provider, FS shall be entitled, in addition to any other remedy which may be available at law or in equity, liquidated damages in the amount of $10,000 per violation of any provision of Section 17 of this Agreement. The parties agree that the amount specified is reasonable given the difficulty in quantifying the potential damages caused by a breach of this Section and that these liquidated damages do not constitute a penalty.** In the event of a dispute among the parties, the prevailing Party, in addition to the award of damages or any other remedy, shall be entitled to recover its attorneys' fees and other reasonable costs incurred in enforcing this Agreement. Further, Provider agrees to reimburse FS on a monthly basis for all reasonable costs and attorneys' fees incurred by FS for action taken by FS under this Section.

**18. ADVERTISING AND USE OF MARKS**

Provider agrees not to use in any advertising, promotion, or press release an endorsement, direct or indirect quotes, or pictures implying endorsement by any personnel of FS or any FS customer(s) without the express written consent of FS. Provider shall not, without the prior written approval of FS or a customer, refer to FS or a customer or any other related entities in any advertising or published communication or use, or allow to be used, the names, logos, trademarks, service marks, patents, copyrights, or trade dress of FS, or any customer of FS. Prior written consent shall be granted at the sole and exclusive discretion of FS and of the customer. FS may develop a name, logo, trademark, or service mark in connection with its program of providing Services to its customers. Upon the prior written approval of FS, Provider may be permitted to use such name, logo, trademark, or service mark in connection with its providing of Services hereunder so long as this Agreement is in effect and Provider is not in breach of any terms or provisions of this Agreement.

**19. REMEDIES**

Provider's sole and exclusive remedy for FS's breach and/or default under this Agreement shall be an action for monetary damages, and Provider irrevocably waives any right to any equitable and/or injunctive relief hereunder. Provider understands and agrees that Provider's services are unique and that FS may suffer irreparable harm in the event that Provider fails to comply with any of Provider's obligations under this Agreement and that monetary damages in such event would be substantial and inadequate to compensate FS. Consequently, Provider agrees that in

such event FS shall be entitled, in addition to such monetary relief as may be recoverable by law, to such temporary, preliminary and/or permanent injunctive and/or other equitable relief as may be necessary to restrain any threatened, continuing and/or further breach by Provider without showing or proving any actual damages sustained by FS, including the remedy of specific performance, without posting bond or other security, and without the necessity of proving actual damages. Any failure by either Party to insist upon or enforce performance by the other Party of any of the provisions of this Agreement, or to exercise any rights or remedies under this Agreement, or otherwise by law, shall not be construed as a waiver or relinquishment of such Party's right to assert or rely upon the provision, right, or remedy in that or any other instance; rather the provision, right, or remedy shall be and remain in full force and effect. The provisions of this paragraph shall survive, indefinitely, the expiration or earlier termination of this Agreement.

**20. GOVERNING LAW AND VENUE**

This Agreement and the rights and obligations of the Parties hereto shall be governed in all respects, including validity, interpretation and effect, by the laws of the State of Arizona (without giving effect to its choice of law principles). All disputes arising out of this Agreement shall be subject to the exclusive jurisdiction and venue of the state or federal courts sitting in Maricopa County, Arizona. Provider consents and agrees to accept service of process outside the State of Arizona in any disputed matter.

**21. WAIVER OF JURY TRIAL/ MEET & CONFER**

(a). Provider and FS irrevocably waive their respective rights to trial by jury on any action, proceeding, or counterclaim, whether at law or in equity, brought by either Provider or FS. No action under this Agreement shall include, by consolidation, joinder, or any other manner, any claims by any person or entity in privity with or claiming through or on behalf of either Provider or FS. Neither Provider nor FS shall litigate as a representative of or on behalf of any other person or entity, any dispute, controversy, or claim of any kind arising out of or relating to this Agreement, Provider's or FS's respective rights and obligations, or any other claims or causes of action relating to Provider's or FS's performance under this Agreement.

(b). The Parties will make good faith efforts to resolve any dispute concerning this Agreement prior to commencing litigation by conducting a meeting regarding the dispute to be attended by representatives with decision-making authority. If the dispute cannot be resolved by the Parties within a reasonable time not to exceed sixty (60) calendar days, which time may be extended by mutual consent of both Parties, then the dispute shall be determined by other legal means available to the Parties including, but not limited to, civil litigation.

**22. ASSIGNMENT**

FS may assign this Agreement without prior notice to, or consent from, Provider. This Agreement (or any portion of the Services herein) may not be assigned or subcontracted (in whole or in part) by Provider without FS's prior written consent.

**23. RIGHT TO OFF-SET**

FS may withhold or off-set from any payment owed to Provider any amount due to FS from Provider under this Agreement or any other agreement between Provider and FS.

**24. PERFORMANCE EXPECTATIONS**

Provider's performance in providing the Services shall be measured by application of the following minimum expectations:

| Trade Operations | Service Level Standard | % Met |
|---|---|---|
| Work order acceptance (Emergency) | < 30 minutes | 80% |
| Work order acceptance (Non-Emergency) | < 1 hour | 75% |
| Response time (Emergency) | Onsite in less than 4 hours | 75% |

-cv-01850-DAR Doc #: 5-1 Filed: 09/15/26 12 of 14. Pa

| | | |
|---|---|---|
| Response time (Non-Emergency) | Onsite within Priority (P24, P48, P72) | 75% |
| Resolution (Emergency) | Within 4 days | 65% |
| Resolution (Non-Emergency) | Within 7 days | 65% |
| First call resolution when no parts required | Same day resolution from first check in | 75% |
| Quote turnaround | Within 24 hours | 75% |
| Invoice turnaround (WO) | Within 10 days of work complete for (demand) | 90% |
| Invoice turnaround (PM) | Invoiced by 10 days after end of service month | 90% |
| All Work Order Resolution | Under 10 days | 75% |
| All Work Order Resolution | Under 20 days | 87.5% |
| IVR | Check in & out usage | 85% |

**25. FORCE MAJEURE**

If the performance by any Party of any non-monetary obligation under this Agreement is directly delayed or prevented in whole or in part by any cause not reasonably and directly within its control including, without limitation, acts of God (with the exception of foreseeable weather events such as winter storms), war, civil disturbances, accidents, damage to its facilities, labor disputes, acts of any governmental body, or failure or delay of third parties (a "Force Majeure" event), it shall be excused, discharged, and released of performance to the extent such performance is so directly limited or prevented without liability of any kind. Nothing herein contained shall be construed as requiring any Party to accede to any demands of labor or labor unions, suppliers, or other entities which it considers unreasonable. Each Party shall use its reasonable efforts to minimize the duration and consequences of any failure of or delay in performance resulting from a Force Majeure event. Either Party may at any time during the continuation of a Force Majeure event immediately terminate this Agreement without liability. Provider will not be entitled to compensation for or during any period of non-performance hereunder.

**26. MISCELLANEOUS**

(a). Entire Agreement: The word "Agreement" as used herein shall include by reference all Schedules referred to in the Agreement and the Agreement and Schedules shall be deemed all one document. This Agreement, and any Schedules hereto, sets forth the entire agreement between the parties hereto. This Agreement may not be changed orally, but only by a separate agreement in writing signed by the Parties hereto. This Agreement supersedes all prior understandings, representations, negotiations, and correspondence between the Parties, constitutes the entire agreement between them with respect to the matters described, and shall not be modified or affected by any course of dealing, course of performance, or usage of trade.

(b). Section Headings. All section headings and captions used in this Agreement are purely for convenience and shall not affect the interpretation of this Agreement.

(c). Modification. Except as otherwise provided, this Agreement shall not be modified except by written agreement signed on behalf of FS and the Provider by their respective authorized officers.

(d). Severability. If any provision of this Agreement is held to be invalid, illegal, or unenforceable, the validity, legality, and enforceability of the remaining provisions shall in no way be affected or impaired. Any illegal, invalid, or unenforceable provision in this Agreement shall be modified to conform to the law, rule, regulation, or guideline with which it conflicts.

(e). Waiver. The failure of either party at any time to require performance by the other of any provision of this Agreement shall in no way affect that Party's right to enforce such provision, nor shall the waiver by either Party of any breach of any provision of this Agreement be taken or held to be a waiver of any further breach of the same provision or any other provision.

(f). Survival. Any provisions of this Agreement (including, without limitation, indemnification obligations) that may be reasonably interpreted to impose any obligation after termination or expiration upon Provider or FS shall survive such termination or expiration and be binding upon Provider and FS.

(g). Disclosure. The Provider shall in each instance obtain the prior written approval of the FS concerning exact text and timing of any news releases, articles, brochures, advertisements, publications, prepared speeches, and of any information releases concerning this Agreement or the Services.

(h). Counterparts. This Agreement may be executed in any number of counterparts and each fully executed counterpart shall be deemed an original.

(i). Notices. All notices, approvals, requests, consents, and other communications given pursuant to this Agreement shall be in writing, and shall be effective when received if hand-delivered, sent by overnight courier service, or sent by United States certified mail, addressed as follows (or to such other address as a party may designate by the giving of proper notice in accordance with this Section):

FacilitySource, LLC
c/o: CEO William Hayden
2020 N. Central Ave., Suite 1200
Phoenix, AZ 85004

(j). Professionals' Fees and Costs. If any suit, action, arbitration, or proceeding of any kind is brought by either Party to this Agreement to enforce, defend, or interpret any provision of this Agreement, the prevailing Party in such action shall recover from the other Party to such action all reasonable costs and expenses which the prevailing Party may incur in bringing such action and/or enforcing any judgment granted therein, all of which shall be deemed to have accrued upon the commencement of such action and shall be paid whether or not such action is prosecuted to judgment. For purposes of this paragraph, the "prevailing Party" means the Party entitled to recover costs of suit, whether or not any action proceeds to final judgment. Any judgment or order entered in such action shall specifically provide for the recovery of all reasonable costs and expenses incurred by the prevailing Party in connection therewith, including, without limitation, costs and expenses incurred in enforcing such judgment. For purposes of this paragraph, "costs and expenses" shall include all court costs and all attorneys', paralegals', and other professionals' fees and costs.

(k). Survival of Representations and Warranties. All representations, warranties, and covenants including, without limitation, any indemnifications, will survive the expiration or earlier termination of this Agreement.

(l). No Waiver. No waiver by any Party of any breach of any provision hereof shall be deemed a waiver of any other breach, whether preceding, contemporaneous with, or subsequent to, the waived breach or waived provision. If any provision of this Agreement is deemed to be invalid, it shall be considered stricken and shall not invalidate the remaining provisions.

(m). Non-Confidential Material. Any ideas, business proposals, or suggestions provided by Provider to FS shall be deemed non-confidential and non-proprietary and may be used or disclosed by FS without liability or compensation, unless otherwise expressly agreed to the contrary in writing by FS.

(n). No Promises. No promises, inducements, or representations not contained in this Agreement shall be of any force or effect or binding upon Provider or FS.

(o). Agreement Controls. Any pre-printed terms or conditions appearing on an invoice from Provider shall be of no force and effect, and shall be expressly superseded by the terms of this Agreement.

(p). Authority to Execute. Each Party represents and warrants that the persons or person executing this Agreement on behalf of such Party has the full legal authority to do so and can fully obligate the Party to all of the terms and conditions of this Agreement.

(q). Time is of the Essence. Time is of the essence of this Agreement and each of its provisions.

© FacilitySource, 2016 Proprietary & Confidential | No Part of This Document May Be Used Without Express Written Permission. 

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the 26 day of February, year 2018.

**FACILITYSOURCE, LLC**

Molly Machold

Digitally signed by Molly Machold
DN: cn=Molly Machold, o, ou=FacilitySource, email=mmachold@facilitysource.com, c=US
Date: 2018.03.07 10:11:20 -07'00'

**PROVIDER**

Flashover Maintenace llc

DocuSigned by:
1B2B4FE60F804C7...

Brian Knowlton

President

2/26/2018